**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATURAL RESOURCES DEFENSE
COUNCIL; WATERKEEPER ALLIANCE,
       *Plaintiffs-Appellees,*

and

STATE OF CONNECTICUT; NEW YORK
STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION;
STATE OF NEW YORK,
   *Plaintiffs-intervenors-Appellees,*

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; STEPHEN L.
JOHNSON,
       *Defendants-Appellants,*

and

NATIONAL ASSOCIATION OF HOME
BUILDERS; ASSOCIATED GENERAL
CONTRACTORS OF AMERICA,
*Defendants-intervenors-Appellants.*

Nos. 07-55183
     07-55261

D.C. No.
CV-04-08307-GHK

OPINION

Appeal from the United States District Court
for the Central District of California
George H. King, District Judge, Presiding

Argued and Submitted
July 17, 2008—Pasadena, California

Filed September 18, 2008

Before: Barry G. Silverman, Johnnie B. Rawlinson, and
Milan D. Smith, Jr., Circuit Judges.

13145

Opinion by Judge Milan D. Smith, Jr.

## COUNSEL

Robert Lundman, United States Department of Justice, Washington, D.C., for the defendants-appellants.

Jeffrey Longworth, Barnes & Thornburg LLP, Washington, D.C., for the defendants-intervenors-appellants.

Kim Landsman, Patterson Belknap Webb & Tyler LLP, New York, New York, & Melanie Shepherdson, National Resources Defense Council, Washington, D.C., for the plaintiffs-appellees.

Douglas P. Carstens, Chatten Brown & Carstens, Santa Monica, California, & Richard Dearing, State of New York, New York, New York, for the plaintiffs-intervenors-appellees.

## OPINION

MILAN D. SMITH, JR., Circuit Judge:

Plaintiffs-Appellees, National Resources Defense Council (NRDC) and Waterkeeper Alliance Inc. (collectively, NRDC), sued Defendants-Appellants, the United States Envi-

ronmental Protection Agency and its administrator (collectively, EPA), under the Clean Water Act (CWA) and the Administrative Procedure Act (APA), seeking to compel the EPA to promulgate effluent limitation guidelines (ELGs) and new source performance standards (NSPSs) for storm water pollution discharges caused by the construction and development industry (construction industry). The States of Connecticut and New York, and the New York State Department of Environmental Conservation (collectively, state-intervenors) intervened on behalf of NRDC; the National Association of Home Builders and Associated General Contractors of America (collectively, industry-intervenors) intervened on behalf of the EPA.

The district court exercised its jurisdiction under the Clean Water Act's citizen-suit provision, CWA § 505(a)(2), 33 U.S.C. § 1365(a)(2),[1] denied Defendants' motion to dismiss, granted Plaintiffs partial summary judgment on their claim that the CWA requires the EPA to issue ELGs and NSPSs for the construction industry, and issued a permanent injunction compelling the EPA to do so.[2] We have jurisdiction to review these decisions under 28 U.S.C. §§ 1291 and 1292(a), and we affirm.

## BACKGROUND

### A. Statutory Background

Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's

---

[1]We cite to the original Act throughout this opinion, and provide a parallel cite to the U.S. Code only the first time we cite each CWA provision. *See Our Children's Earth Found. v. EPA*, 527 F.3d 842, 845 n.1 (9th Cir. 2008) [hereinafter *OCEF*].

[2]As used throughout this opinion, the term "Defendants" refers to the EPA and industry-intervenors. The term "Plaintiffs" refers to NRDC and state-intervenors.

waters." 33 U.S.C. § 1251(a). In furtherance of the CWA's objective of eliminating the "discharge of pollutants into the navigable waters," *id.*, the Act prohibits the "discharge of any pollutant." CWA § 301(a), 33 U.S.C. § 1311(a). The CWA defines the "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." CWA § 502(12), 33 U.S.C. § 1362(12). A "point source" is "any discernable, confined and discrete conveyance, including but not limited to[,] any pipe, ditch, channel . . . from which pollutants are or may be discharged." CWA § 502(14).

Despite § 301(a)'s general prohibition on the discharge of pollutants, the CWA also establishes a permit system that authorizes the discharge of some pollutants—the National Pollutant Discharge Elimination System (NPDES). *See* CWA § 402, 33 U.S.C. § 1342. Under the NPDES, the EPA and approved states may issue permits for the discharge of pollutants that meet certain requirements outlined in § 402. Taken together, §§ 301(a) and 402 " 'prohibit[ ] the discharge of any pollutant from a point source into navigable waters of the United States without an NPDES permit.' " *N.W. Envt'l Advocates v. EPA*, __ F.3d __, Nos. 03-74795, 06-17187, 06-17188, 2008 WL 2813103, at *1 (9th Cir. July 23, 2008) (quoting *N. Plains Res. Council v. Fidelity Exploration & Dev. Co.*, 325 F.3d 1155, 1160 (9th Cir. 2003)).

NPDES permits "place limits on the type and quantity of pollutants that can be released into the Nation's waters," *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102 (2004), and must set forth "effluent limitations," *OCEF*, 527 F.3d at 848. "Effluent limitations" are "restriction[s] . . . on [the] quantit[y], rates, and concentration[ ] of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters." CWA § 502(11).

The specific effluent limitations in an NPDES permit are determined according to the more general ELGs and NSPSs,

guidelines that are separately promulgated by the EPA. CWA § 304(b), 33 U.S.C. § 1314(b); CWA § 306(b), 33 U.S.C. § 1316(b); *E.I. duPont de Nemours & Co. v. Train*, 430 U.S. 112, 116-17 (1977). ELGs are technology-based restrictions on water pollution that apply to sources of pollution already in existence, *see* CWA § 304(b); NSPSs are technology-based restrictions that apply to "new sources" of pollution. CWA § 306(a)(2). "A technology-based approach to water quality focuses on the achievable level of pollutant reduction given current technology." *OCEF*, 527 F.3d at 845; *see also Waterkeeper Alliance, Inc. v. EPA*, 399 F.3d 486, 491-92 (2d Cir. 2005) (stating that ELGSs and NSPSs "are technology-based, because they are established in accordance with various technological standards that the Act statutorily provides" —for example, "the best available technology economically achievable" or "the best conventional pollutant control technology"—and that these standards "vary depending upon the type of pollutant involved, the type of discharge involved, and whether the point source in question is new or already existing").

Section 304(m) provides that, every two years, the EPA "shall publish in the Federal Register a plan which shall . . . identify categories of sources discharging toxic or nonconventional pollutants" for which ELGs and NSPSs have not yet been published, and "establish a schedule for promulgation of effluent guidelines for categories identified." Under this schedule, the "promulgation of [these] guidelines shall be no later than . . . 3 years after the publication of the plan." *Id.* ELGs and NSPSs are relevant to this appeal because the Plaintiffs claim that the EPA violated a non-discretionary duty to promulgate ELGs and NSPSs for the construction industry after it was listed as a point-source category in a plan developed under § 304(m).

## B. Administrative Proceedings

In March 1999, the EPA announced that it was undertaking rulemaking to address pollution from storm water discharge

associated with construction activities, "specifically for new development, as well as to those associated with re-development activities." 64 Fed. Reg. 15,158, 15,158 (March 30, 1999). In its public notice, the EPA stated that it "chose to begin development of [ELGs] for the construction and development industry[, in relevant part,] to support applicable state and local requirements for erosion and sediment controls and storm water best management practices," because "[s]tate and local requirements vary widely [and] [s]ediment loadings from construction site discharges can be orders of magnitude higher than those associated with discharges from undisturbed areas," and also because "construction site runoff can contribute high loadings of nutrients and metals to receiving streams." *Id.* In 2000, the EPA published its final notice of an effluent guidelines plan, which listed construction activities as a point-source category requiring guidelines under § 304(m). 65 Fed. Reg. 53,008, 53,011 (Aug. 31, 2000).

On June 24, 2002, the EPA issued a proposed rule to address storm water discharge from construction sites. 67 Fed. Reg. 42,644, 42,644 (June 24, 2002). The EPA did not set forth a single proposed rule, but described three "options" it was considering. "Option 1" was to establish "minimum requirements for conducting site inspections and providing certification as to design and completion of controls required by" the authority issuing NPDES permits. *Id.* at 42,646. "Option 2" would establish ELGs as well as the minimum requirements comprising Option 1. *Id.* "Option 3" would establish "no new requirements," and "[b]oth the control requirements and the certification requirements would be left to the best professional judgment of the permitting authority." *Id.*

On April 26, 2004, the EPA published its final action under the caption "Proposed Rule: Withdrawal." 69 Fed. Reg. 22,472, 22,472 (April 26, 2004). The EPA stated: "[t]his action withdraws the proposed [ELGs and NSPSs] that EPA proposed for the construction and development industry" on June 24, 2002. *Id.* at 22,473. It further stated, "[w]e have

decided not to promulgate [ELGs] and standards for the construction and development industry and instead have selected the option [Option 3] that relies on the range of existing programs, regulations, and initiatives at the Federal, State, and local level for the control of storm water runoff from construction sites." *Id.* at 22,477.

The EPA explained its decision "not to promulgate [ELGs] and standards" by stating that it believed that construction site storm water discharges were already "being adequately addressed" because the "existing NPDES" regulations require permits for the vast majority of construction sites nationwide, and that the cost was "simply too high and . . . disproportionately large" given the reductions that would be attributable to the proposed ELGs. *Id.* The EPA had determined that the annual cost of the proposed ELGs would be more than half a billion dollars and would result in the displacement of a number of jobs while the existing permit programs were capable of controlling 80-90% of sediment runoff from construction sites and the proposed rule would only remove an additional 1% more. *Id.* The EPA also "decided not to promulgate NSPS[s] because . . . discharges associated with construction activity generally are not appropriately characterized as 'new sources,' " and the EPA believed that the definition of "new source" should be read to exclude construction sites. *Id.* at 22,480 ("To include construction activity itself within the definition of a 'new source' would be to view construction sites as things that are themselves constructed.").

In subsequent years, the EPA removed the construction industry from plans it published under § 304(m). *See* 69 Fed. Reg. 53,705 (Sept. 2, 2004); 71 Fed. Reg. 76,644 (Dec. 21, 2006). In its 2004 plan, the EPA stated:

> [T]he analysis under CWA section 304(m)(1)(B) applies only to industrial categories of sources that are discharging non-trivial amounts of toxic or non-conventional pollutants to waters of the United

States. EPA did not consider, under this analysis, industrial activities where conventional pollutants, rather than toxic or non-conventional pollutants, are the pollutants of concern. For example, although EPA had identified stormwater discharges from [the construction industry] as a new category in its 2000 and 2002 effluent guidelines program plans, EPA is not identifying [the construction industry] in this 2004 plan based on new information that discharges from this activity consist predominately of conventional pollutants under CWA § 304(a)(4), in this case total suspended solids.

69 Fed. Reg. at 53,718. In its 2006 plan, EPA similarly stated that it "did not identify . . . the construction industry because its discharges consist almost entirely of conventional pollutants," and that the "EPA mistakenly identified this industry under section 304(m)(1)(B) in the 2002 plan, not realizing that its discharge" was so composed. 71 Fed. Reg. at 76,664-65. According to the EPA, it corrected its mistake by removing the industry from its 2004 plan. *Id.*

## C.  District Court Proceedings

NRDC and the state-intervenors brought this suit to challenge the EPA's decision not to issue ELGs and NSPSs for the construction industry after it had listed the industry in a plan it issued under § 304(m). The EPA and the industry-intervenors moved to dismiss, claiming that this court, not the district court, had original jurisdiction pursuant to § 509(b)(1)(E), 33 U.S.C. § 1369(b)(1)(E), that the Plaintiffs lacked standing to sue, and that certain claims were precluded.[3] The district court denied the motion to dismiss.

---

[3]The Defendants have abandoned their claim preclusion argument on appeal.

The district court granted the Plaintiffs' motion for partial summary judgment on the basis that the EPA failed to comply with the CWA by not performing its non-discretionary duty to promulgate ELGs and NSPSs for the construction industry. The district court issued a permanent injunction requiring the EPA to issue ELGs and NSPSs for the construction industry no later than December 1, 2009. Defendants now appeal these rulings.

## DISCUSSION

### A.  District Court's Original Jurisdiction

#### 1.  Standard of Review

We review a district court's assumption of jurisdiction de novo. *United States v. Bennett*, 147 F.3d 912, 913 (9th Cir. 1998). We also review a district court's interpretation of the CWA de novo. *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1183 (9th Cir. 2002).

#### 2.  Analysis

[1] CWA § 505(a)(2) grants the district court jurisdiction over suits "against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." Section 505(a)(2) is an exclusive grant of original jurisdiction to the district courts. *Trustees for Alaska v. EPA*, 749 F.2d 549, 558 (9th Cir. 1984). CWA § 509(b)(1)(E) grants the courts of appeal jurisdiction to "[r]eview . . . the Administrator's action . . . in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title." Section 509(b)(1)(E) is an exclusive grant of original jurisdiction to the courts of appeal. *OCEF*, 527 F.3d at 847 (referring to § 509(b)(1) as "the circuit court's exclusive jurisdiction"); *Maier v. EPA*, 114 F.3d 1032,

1037 (10th Cir. 1997) (calling the court of appeals' jurisdiction under § 509(b)(1) "exclusive"). However, we have cautioned that our jurisdiction under § 509(b)(1) is not to be construed expansively, particularly given the "specificity and precision" that Congress used in identifying the actions that fall under § 509(b)(1). *N.W. Envt'l Advocates*, 2008 WL 2813101, at *6.

**[2]** Defendants argue that the district court erred in exercising jurisdiction under § 505(a)(2), and that this court has exclusive original jurisdiction over Plaintiffs' claim that the EPA violated its non-discretionary duty to promulgate ELGs and NSPSs under § 509(b)(1)(E).**⁴** Plaintiffs argue that the district court properly exercised its jurisdiction. We agree with Plaintiffs, and we hold that where a plaintiff alleges that the EPA has failed to perform a non-discretionary duty under the CWA and the plaintiff does not challenge the substance of any existing regulations, the district courts have exclusive jurisdiction under § 505(a)(2).

In *Trustees for Alaska*, the NRDC alleged a failure by the EPA "to comply with a nondiscretionary duty to promulgate industry-wide rules." 749 F.2d at 558. We concluded that the district court had exclusive jurisdiction over the action under § 505(a)(2), stating that where a plaintiff alleges a failure by the EPA "to perform any act or duty under the [CWA] which is not discretionary," the federal district courts have exclusive jurisdiction. *Id.* (quoting CWA § 505(a)(2)). Here, as in *Trustees for Alaska*, the Plaintiffs have alleged a failure by the Administrator to perform a non-discretionary duty. *Cf. id.* ("[T]he EPA has not yet promulgated regulations [establishing ELGs] governing the placer miner industry.").

---

**⁴**For analytical purposes in determining whether the district court or the court of appeals has original jurisdiction, we assume, as Plaintiffs claim, that the EPA's duty to promulgate ELGs and NSPSs is not discretionary. We reach the merits of whether the EPA's duty is discretionary in Section C, *infra*.

We acknowledge that the underlying facts in *Trustees for Alaska* differ slightly from the facts of this case. Though the EPA did not promulgate ELGs for the relevant industry in either case, in *Trustees for Alaska*, the agency had not undertaken a rulemaking or any other procedural step towards promulgating ELGs. In contrast, here, the EPA gave notice and provided comment periods and proposed three "options" before choosing not to promulgate ELGs and NSPSs related to storm water runoff from construction sites. And, as a result of its rulemaking, the EPA made an affirmative choice to "rel[y] on the range of existing programs, regulations, and initiatives at the Federal, State, and local level for the control of storm water runoff from construction sites." 69 Fed. Reg. at 22,477.

This distinction does not affect our jurisdictional analysis, however, because Plaintiffs do not challenge the substance of any of these existing programs or regulations. Plaintiffs do not discuss the substance of any existing regulations or express any opinion concerning the existing regulations. Thus, just like the plaintiffs in *Trustees for Alaska*, Plaintiffs here are concerned exclusively with the EPA's *failure* to promulgate certain guidelines. Such an action falls squarely within the district court's jurisdiction. *Trustees for Alaska*, 749 F.2d at 558; *see* CWA § 505(a)(2) (granting the district court jurisdiction over suits "against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator").

Indeed, the fact that Plaintiffs do not challenge the *substance* of any existing regulations is precisely why § 509(b)(1)(E) is inapplicable. Section 509(b)(1)(E) grants the court of appeals jurisdiction to "[r]eview . . . the Administrator's action . . . in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title." Even if, as Defendants argue, we could construe the EPA's decision to rely on existing regulations as

an "approval" of an "other limitation" under one of the enumerated sections, this is insufficient to bring Plaintiffs' claim within § 509(b)(1)(E). This is so because Plaintiffs do not seek a review of the existing regulations that the Administrator is alleged to have "approved."

[3] To the extent any doubt remains about whether the district court had original jurisdiction over Plaintiffs' claim, it is easily resolved by our recent decision in *Our Children's Earth Foundation*. In *OCEF*, environmental groups contended that the EPA "failed to fulfill its mandate to review effluent guidelines and limitations in a timely manner and in accord with technology-based standards." 527 F.3d at 844. The court affirmed the district court's exercise of jurisdiction under § 505(a)(2), stating that this court's exclusive jurisdiction under § 509(b)(1) "extends only to a *substantive* review of the appropriateness of the guidelines actually promulgated, and not to the threshold question of whether the statutory requirements of the CWA have been met." *Id.* at 847 (emphasis added); *see also N.W. Envt'l Advocates*, 2008 WL 2813103, at *7 ("Section 509(b)(1)(E) authorizes original court of appeals jurisdiction for challenges to regulations that establish numerical limitations and similar limits."). Because Plaintiffs never requested such a substantive review, but rather asked the district court to answer the "threshold question of whether the statutory requirements of the CWA [were] met" with respect to regulating storm water runoff from construction activities, *OCEF* confirms that the district court's exercise of jurisdiction under § 505(a)(2) was proper. 527 F.3d at 847.

This case differs from the Tenth's Circuit's decision in *Maier* precisely because Plaintiffs are not requesting a review of existing regulations. In *Maier*, the court held that it had jurisdiction under § 509(b)(1)(E) to hear a challenge to the EPA's denial of a petition requesting that the EPA initiate a rulemaking on certain CWA regulations. 114 F.3d at 1038. At first glance, *Maier* bears some similarity to this case because the plaintiff in *Maier* challenged the EPA's choice not to take

a certain action. *See id.* at 1036. In *Maier*, however, as a part of his challenge, the plaintiff argued that "the existing regulations . . . were inadequate." *Id.* The *Maier* court noted that it had "no difficulty construing [the suit] as a challenge to an 'action in approving or promulgating' " under § 509(b)(1)(E) because the plaintiff was "essentially challenging the sufficiency of the EPA's secondary treatment regulation." *Id.* at 1038. Indeed, the court specified that "[w]here petitioners' challenge is to the *substance of a regulation that the agency has already promulgated*, exclusive jurisdiction in the court of appeals may not be evaded merely by styling the claim as one for failure to revise." *Id.* (emphasis added). Moreover, the *Maeir* court went on to distinguish the case before it from *Trustees for Alaska* and other cases, like this case, where "the EPA had failed to issue the disputed regulations at all." *Id.* at 1039.

*Pennsylvania Department of Environmental Resources v. EPA*, 618 F.2d 991 (3d Cir. 1980), also supports our analysis. That case involved the EPA's promulgation of NSPSs for the coal mining industry. *Id.* at 993. The EPA had added the coal mining industry as a new category of point sources and promulgated regulations; but, for certain water polluting discharges, the regulations issued merely deferred the promulgation of regulations. *Id.* at 993-94. Noting that the plaintiffs were seeking to compel the EPA to perform a non-discretionary duty to promulgate NSPSs, the court concluded that the suit should have been brought in district court under § 505(a)(2). *Id.* at 995.

**[4]** Significantly, the Third Circuit noted that in cases where the courts of appeal have jurisdiction to review a failure to act under § 509, the review focuses on the substance or effect of promulgated regulations and not "a petitioner's request that the EPA be ordered to promulgate new or different regulations." *Id.* at 996. We agree with the Third Circuit that "an allegation of inadequacy of a set of regulations is quite different from" what Plaintiffs' allege here—"that a

needed regulation was nonexistent." *Id.* We therefore hold that the district court properly exercised its jurisdiction over Plaintiffs' claim that the EPA had violated its non-discretionary duty to promulgate ELGs and NSPSs for the construction industry under § 505(a)(2).

## B. Standing

### 1. Standard of Review

We review a district court's determination of standing de novo. *Buono v. Norton*, 371 F.3d 543, 545 (9th Cir. 2004).

### 2. Analysis

#### a. Environmental-Group Plaintiffs

Organizations have standing to sue on behalf of their members when: "(a) [the] members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) (internal quotation marks and citations omitted). The industry-intervenors challenge only whether the members of the environmental-group Plaintiffs (NRDC and Waterkeeper Alliance) have standing to sue in their own right under Article III.[5] We conclude that they do.

[5] To meet Article III's standing requirements, the party invoking federal jurisdiction bears the burden to show that it has: (1) "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical"; (2) that the injury is "fairly trace[able] to the challenged

---

[5]The EPA has not argued that any Plaintiff lacks standing on appeal.

action of the defendant"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks and citations omitted). In addition to these Article III standing requirements, our exercise of jurisdiction is also limited by prudential considerations. *Bennett v. Spear*, 520 U.S. 154, 162 (1997). One such consideration is whether a plaintiff's grievances "arguably fall within the zone of interests protected or regulated by the statutory provision . . . invoked in the suit." *Id.* Section 505(a)(2) of the CWA is, however, a citizen-suit provision that "extends standing to the outer boundaries . . . of Article III." *Ecological Rights Found.*, 230 F.3d at 1147 (citing *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 16 (1981)). As a result, we need not consider whether Plaintiffs have prudential standing in this case.

We turn first to whether the members of the environmental-group Plaintiffs have suffered an injury in fact. "The 'injury in fact' requirement in environmental cases is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct." *Id.*; *see also Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859-60 (9th Cir. 2005) (stating that injury in fact requires an individual to show "a connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable . . . if the area in question remains or becomes environmentally degraded") (internal quotation marks and citation omitted). The injury to the plaintiff, not to the environment, is the relevant showing. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000).

[6] Members of the NRDC and Waterkeeper Alliance have submitted several declarations averring that they have suffered an injury in fact. These declarations state that the mem-

bers have, for years, used particular waterways for aesthetic and recreational purposes. They also state that the individuals' use and enjoyment of those waterways has been diminished due to storm water discharge from construction sites, and many declarations describe having observed storm water discharge flowing directly from construction sites into the waterways the members use. The Supreme Court found similar evidence sufficient to establish injury in fact in *Friends of the Earth*. In that case, the Court concluded that the environmental group members established injury in fact where their "reasonable concerns about the effects of [Laidlaw's discharges], directly affected [their] recreational, aesthetic, and economic interests." *Friends of the Earth*, 528 U.S. at 183-84. Similarly, here, the members' statements that their use of specific waterways has been diminished due to their concerns about discharge from a particular source (here, the construction sites) are sufficient to establish injury in fact.

[7] Industry-intervenors also argue that the members of the environmental-group Plaintiffs cannot show that their injury is "fairly trace[able] to the challenged action of the defendant" or "redressable" by the relief they request—i.e., the EPA's promulgation of ELGs and NSPSs. *Lujan*, 504 U.S. at 560-61. These factors, both of which address "causation," are closely related and we discuss them together. *See Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984) (noting that the "traceability" and "redressability" requirements of Article III standing are closely related).

[8] At the outset of this analysis, we observe that Plaintiffs' showing on these two factors—whether their injuries are "traceable" to the EPA's failure to promulgate ELGs and NSPSs and would be "redressed" by the EPA's promulgation of ELGs and NSPSs—cannot be entirely precise absent knowledge of the substance of the regulations that the EPA would promulgate if required to do so.[6] As the district court

---

[6]Though Plaintiffs do not claim that the EPA denied them any procedure to which they were entitled, their suit is nevertheless similar to suits

noted, to require a precise showing "would mean that *no* plaintiff would have standing to bring such a suit, as one cannot demonstrate the efficacy of regulations that have yet to be issued." Thus, Plaintiffs can satisfy the "traceability" and "redressability" factors by showing that the type of storm water discharge causing their injury is that which ELGs and NSPSs aim to address, and that ELGs and NSPSs are likely to reduce the risk of the pollution causing their injury. *See Ecological Rights Found.*, 230 F.3d at 1152 n.12 (acknowledging that the CWA's rules are "designed to reduce the risk of pollution"). Plaintiffs have made this showing.

[9] First, the members' declarations support that the pollution they complain of is that which ELGs and NSPSs aim to address. The members' declarations support that storm water discharge flows from active construction sites into the bodies of water they use and enjoy, and that the storm water runoff they complain of is polluting and diminishing the quality of the bodies of water they use. *See, e.g.*, Anna E. Slawsky Decl. ¶ 8 ("I have personally seen sediment run off from a 2-acre

where the plaintiff claims such a procedural injury. The Supreme Court has noted that suits to force an agency to engage in a procedure do not require the same certainty that the result of that procedure will have the desired effect. *See Massachusetts v. EPA*, 127 S. Ct. 1438, 1453 (2007) (citing *Lujan*, 504 U.S. at 572 n.7). A party can therefore enforce a procedural right "so long as the procedures in question are designed to protect some threatened concrete interest of [theirs] that is the ultimate basis of [their] standing." *Lujan*, 504 U.S. at 573 n.8; *see also Massachusetts v. EPA*, 127 S. Ct. at 1453 (stating that a litigant vested with a procedural right "has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision" alleged to have harmed the litigant); *see also Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 705-06 (D.C. Cir. 1988) ("We note, however, that a party seeking judicial relief need not show to a certainty that a favorable decision will redress his injury. A mere likelihood will do.") (citations omitted). The Plaintiffs here meet this standard: the relief they call for is designed to protect the Nation's waterways, and it is their diminishing ability to use and enjoy these waterways that is the ultimate basis of their standing.

construction site and a 33-acre construction site (Puppy Creek runs brown from this site) in Lowell during rains and the erosion along Route 74 mentioned above."); Michael Mullen Decl. ¶ 17 ("[B]eginning in 2000 until the present day, I have conducted inspections of the Prospect Ridge Subdivision Extension in Troy, Alabama. . . . A number of my inspections at Prospect Ridge were made during or just following rain events. During my inspections I witnessed runoff with very high turbidity and excessive amounts of sediment entering streets and subsequently storm drains or unnamed tributaries to Big Creek."); Don McEnhill Decl. ¶ 15 ("I have personally witnessed construction activities causing major discharges of pollutants, including sediment, and documented well over two-dozen construction sites releasing pollutants into the Russian River watershed."); *id.* ¶ 24 ("During the rain season of 2003-2004, I conducted several site visits at the Vintage Greens subdivision development in Windsor, California. I was interested in [this] development because it was a large development and stormwater discharged . . . would flow into the Windsor Creek and then to the Russian River. During my visits I witnessed constant stormwater flows containing sediment from the construction site . . . brown in color and very turbid."); Constance Powell Decl. ¶¶ 6-7 ("Construction and development is continuing . . . I have personally seen sediment run off from construction sites flow directly to Lake Johnson."). In one declaration, Michael Mullen, the Choctawhatchee Riverkeeper and the Director of the Center for Environmental Research and Service at Troy University, described how he sampled the turbidity of two tributaries and concluded that, as a result of construction runoff, the turbidity downstream from the construction site was higher than the turbidity upstream in both tributaries. Michael Mullen Decl. ¶ 23.

Industry-intervenors contend that the environmental-group Plaintiffs' causation evidence is nevertheless insufficient because they have not definitively established that the pollution they complain of is composed of the toxic and non-

conventional pollutants that ELGs and NSPSs address. We disagree. By including the construction industry in plans issued pursuant to § 304(m), the EPA necessarily identified the construction industry as a source of toxic and non-conventional pollutants. *See* CWA § 304(m)(1)(B) (requiring the EPA to publish a plan identifying "categories of sources discharging *toxic or nonconventional pollutants* for which guidelines . . . have not previously been published") (emphasis added). In fact, the EPA has explicitly stated that storm water runoff from construction sites includes toxic and non-conventional pollutants.[7]

*American Petroleum Institute v. EPA*, 216 F.3d 50 (D.C. Cir. 2000), does not suggest that any further evidence of causation is required in this case. In *American Petroleum Institute*, the plaintiffs challenged the EPA's decision not to list sediment found in discarded unleaded gasoline storage tanks (UGSTS) as hazardous waste under the Resource Conservation and Recovery Act (RCRA). *Id.* at 63. The plaintiffs' standing was challenged on the ground that they failed "to link the harms of which their members complain with the reg-

---

[7]For example, the EPA stated in 1999 that storm water runoff "may contain or mobilize high levels of contaminants," including "toxic pollutants [and] toxins," and that the highest concentrations of such contaminants occurs "during the first major storm after an extended dry period." 64 Fed. Reg. 68,722, 68,724 (Dec. 8, 1999). The EPA went on to state "[i]ndividually and combined, these pollutants impair water quality, threatening designated beneficial uses and causing habitat alteration or destruction." *Id.* The EPA further concluded that intensive construction activity may severely impact watersheds "because of high pollutant loads, primarily sediments." *Id.* at 68,728. Though the EPA later suggested that discharge from the construction industry was "predominately" or "almost entirely" composed of conventional pollutants and that the EPA lacked data to indicate that toxic and non-conventional pollutants are found in construction site runoff *nationwide*, these statements do not squarely reject the EPA's earlier statements and still allow that the discharge at issue is composed of at least some toxic or non-conventional pollutants or toxins. *See* 69 Fed. Reg. at 53,718 (Sept. 2, 2004); 71 Fed. Reg. at 76,664 (Dec. 21, 2006); 69 Fed. Reg. 22,472, 22,480 (April 26, 2004).

ulatory actions that they wish EPA to take." *Id.* The D.C. Circuit faulted the plaintiffs for failing to present evidence that the landfills that their members lived near were "of a class substantially likely to receive UGSTS-filled shipments" or that "the effects of UGSTS are evident in the landfill's groundwater." *Id.* at 64. The court further noted that the affidavits the plaintiffs submitted did not trace the pollution of concern to UGSTS waste. *Id.* at 65. In contrast to the plaintiffs in *American Petroleum Institute*, who were challenging the EPA's failure to classify one particular pollutant as hazardous waste, the Plaintiffs here allege the EPA has violated a statute "designed to reduce the risk of pollution." We have previously noted that the CWA, in contrast to the statute at issue in *American Petroleum Institute*, "embodies a range of prophylactic . . . rules designed to reduce the risk of pollution." *Ecological Rights Found.*, 230 F.3d at 1152 n.12. And we have further stated that "[i]t is not necessary for a plaintiff challenging violations of rules designed to reduce the *risk* of pollution to show the presence of *actual* pollution in order to obtain standing." *Id.*

**[10]** Second, by requiring effluent limitations, which are developed according to ELGs and NSPSs, as a part of a strategy to eliminate the discharge of pollutants and restore and maintain the integrity of the Nation's waters, 33 U.S.C. § 1251(a), Congress has expressed its view that developing ELGs and NSPSs reduces the risk of the pollution causing the members' injury. Where Congress has expressed the need for specific regulations relating to the environment, that expression supports an inference that there is a causal connection between the lack of those regulations and adverse environmental effects. *See Nat'l Wildlife Fed'n*, 839 F.2d at 708; *see also Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981, 984-85 (9th Cir. 1994) (noting that plaintiffs could meet the redressability requirement because Congress had already determined the relief they sought was the appropriate means of achieving desired water quality where other methods had failed); *cf. Int'l Ladies Garment Workers' Union v. Donovan*,

722 F.2d 795, 811-12 (D.C. Cir. 1983) ("[A]s Congress passed the Act partly to provide redress to employers from unfair competition, the suggestion that effective enforcement of the Act will not have this effect directly contravenes the congressional judgment underlying the Act.").

[11] Together, the members' declarations establishing that storm water discharge from the construction industry is polluting the waterways they use, the EPA's findings that such discharge may consist of toxic and non-conventional pollutants, and Congress' determination that ELGs and NSPSs reduce the risk of such pollution, are sufficient to establish "traceability" and "redressability." Based on the foregoing, we conclude that the environmental-group Plaintiffs have standing.

### b.   State-intervenors

Only one of the Plaintiffs must have standing to permit our review. Thus, we consider the state-intervenors' standing, a matter that industry-intervenors challenge, only very briefly. *See Massachusetts v. EPA*, 127 S. Ct. at 1453 ("Only one of the petitioners needs to have standing to permit us to consider the petition for review."). As with the environmental-group Plaintiffs, the industry-intervenors contend that the state-intervenors do not claim an injury that is traceable to the EPA's decision not to promulgate ELGs and NSPSs or that would be redressed by the promulgation of EGLs or NSPSs.

[12] State-intervenors claim an injury to their proprietary interest in protecting their waterways.[8] *See City of Sausalito*

---

[8]The industry-intervenors incorrectly assert that the state-intervenors are barred from litigating as *parens patrie* to enforce a federal statute against the federal government. In *Massachusetts v. EPA*, the Supreme Court recognized that Massachusetts (among other states) was entitled to challenge the EPA's rejection of its rulemaking petition regarding motor-vehicle emissions under the CWA. 127 S. Ct. at 1454-55. The Court noted that

*v. O'Neill*, 386 F.3d 1186, 1198 (9th Cir. 2004) ("A municipality . . . has a proprietary interest in protecting its natural resources from harm."). Specifically, they claim that they are injured by the increased pollution in their waterways from upstream, out-of-state construction sites due to the absence of national standards to govern storm water runoff from construction sites. This injury is sufficient to constitute an injury in fact. *See id.* (concluding that the City of Sausalito met its burden to establish an "injury in fact" based on its proprietary interests).

**[13]** The state-intervenors have also submitted declarations to establish that the pollution they complain of is connected to a lack of national standards. Patricia Primi, an Environmental Scientist in the Environmental Protection Bureau of the New York State Office of the Attorney General, submitted a declaration attesting that storm water runoff from construction sites in Vermont, New Hampshire, and Massachusetts is contributing pollutants to the Long Island Sound, and that storm water runoff from Vermont is contributing pollutants to the Lake Champlain Basin. Patricia Primi Decl. ¶¶ 18-19, 23-24. Angus Eaton, the Chief of the General Permits Section in the Division of Water for the New York State Department of Environmental Conservation, submitted a declaration supporting that the upstream states to which Primi referred have different discharge standards enabling a discharge downstream

---

given Congress' recognition of a procedural right to challenge the rejection of rulemaking petitions and "Massachusetts' stake in protecting its quasi-sovereign interest to protect its territory, the Commonwealth is entitled to special solicitude in our standing analysis." *Id.* In reaching this conclusion, the court relied on *Georgia v. Tennessee Copper Company*, in which Georgia's quasi-sovereign interest in "all the earth and air within its domain" supported federal jurisdiction over its efforts to protect its sovereign territory from air pollution originating outside its borders. 206 U.S. 230, 236-37 (1907). Likewise, here, the state-intervenors have an interest in protecting in-state waterways from pollution originating outside their borders.

of excessive amounts of "pollutants found in stormwater run-off" from construction sites. Angus K. Eaton Decl. ¶ 16. And, as stated above, we take into account Congress' view that the promulgation of ELGs and NSPSs will reduce the likelihood of the pollution of which the state-intervenors complain. *See supra* Section B.2.a. We therefore conclude that the state-intervenors also have standing.

## C.   The EPA's Duty to Promulgate ELGs and NSPSs

### 1.   Standard of Review

We review a district court's grant of summary judgment de novo. *Buono*, 371 F.3d at 545. And, as stated above, we review the district court's interpretation of the CWA de novo. *League of Wilderness Defenders/Blue Mountains Biodiversity Project*, 309 F.3d at 1183. Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

### 2.   Analysis

We must decide whether the EPA had discretion to determine whether to promulgate ELGs and NSPSs for storm water runoff from the construction industry once it listed the construction industry as a point source category in a plan published pursuant to § 304(m). We hold that once the EPA listed the construction industry as a point-source category, it was required to promulgate ELGs and NSPSs. We therefore affirm the district court's grant of summary judgment and the permanent injunction.

When reviewing the EPA's construction of a statute that it administers, we follow the two-step approach set forth in *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 842-44 (1984). At step one, if Congress has "unambiguously

expressed its intent on the issue before the court . . . 'the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.' " *Natural Res. Def. Council v. EPA*, 526 F.3d 591, 602 (9th Cir. 2008) (quoting *Chevron*, 467 U.S. at 842-43 & n.9). But if the statute is "silent or ambiguous" with respect to the issue before the court, we will proceed to step two and decide if the agency's interpretation " 'is based on a permissible construction of the statute.' " *Id.* (quoting *Chevron*, 467 U.S. at 843). We defer to the agency's interpretation as long as it is "based on a permissible construction." *Chevron*, 467 U.S. at 843.

**[14]** We conclude that the language of the CWA, when viewed in its entirety, is clear that the EPA must promulgate ELGs and NSPSs for the point-source categories it lists in any plan it publishes under § 304(m). Our analysis begins with § 304(m)(1), which requires the EPA, every two years after February 4, 1987, to "publish in the Federal Register a plan that shall"

> (A) establish a schedule for the annual review and revision of promulgated effluent guidelines . . . ; (B) identify categories of sources discharging toxic or nonconventional pollutants for which guidelines under subsection (b)(2) . . . and section 1316 . . . have not previously been published; and (C) establish a schedule for promulgation of effluent guidelines for categories identified in subparagraph (B), under which promulgation of such guidelines shall be no later than . . . 3 years after the publication of the plan for categories identified in later published plans [i.e. plans not published within 12 months after February 4, 1987].

By requiring the EPA to "establish a schedule" under which the guidelines—the ELGs and NSPSs— are promulgated "no later than . . . 3 years after the publication of the plan," Congress' intent to require the EPA to promulgate guidelines is

clear.⁹ Indeed, Congress used unequivocal language, stating, in relevant part: "[the] promulgation of such guidelines *shall be no later than . . .* 3 years after the publication of the plan." CWA § 304(m) (emphasis added.); *see Alabama v. Bozeman*, 533 U.S. 146, 153 (2001) ("The word 'shall' is ordinarily the language of command.") (internal quotation marks and citation omitted).

**[15]** Other provisions in the CWA likewise support that Congress intended the promulgation of ELGs and NSPSs to be mandatory once a point-source category was listed in a plan under § 304(m). *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2534 (2007) (stating that the court should not examine statutory provisions in isolation but "with a view to their place in the overall statutory scheme") (internal quotation marks and citations omitted). Section 304(b), which is referenced by § 304(m)(1), states: "For the purpose of adopting or revising effluent limitations . . . the Administrator *shall . . . publish* within one year of October 18, 1972, regulations, providing guidelines for effluent limitations." (Emphasis added). Thus, Congress has con-

---

⁹Defendants contend that our analysis of whether the EPA has a nondiscretionary duty to promulgate NSPSs is controlled by § 306, the provision specifically addressing NSPSs. We disagree. First, because § 304(m)(1) expressly references § 306 and applies to both ELGs and NSPSs, our interpretation of that provision and the duty it creates applies equally to ELGs and NSPSs identified in a plan under § 304(m)(1).

Second, the district court, based on information provided by the EPA, found that "since [§ 304(m)] was enacted, the EPA has promulgated NSPSs for categories included in [§ 304(m)] plans, but has added no new categories to [the list of categories in § 306]. Hence [§ 304(m)] seems currently to be the only vehicle by which the EPA identifies new source categories for the purpose of developing NSPSs." The Defendants have not disputed this finding. We therefore conclude that because § 304(m)—in its text and in the EPA's application—grants the EPA the authority to promulgate both ELGs and NSPSs, our analysis here applies equally to both. In light of the above, we need not address industry-intervenors' suggestion that the Plaintiffs failed to plead a claim for breach of a non-discretionary duty under § 306.

sistently used mandatory language with respect to the promulgation of ELGs.

[16] Section 402(a)(1) also supports our interpretation. That section governs the NPDES and states the EPA may issue NPDES permits if the discharge will meet: (A) "all applicable requirements under [various other sections] of this title," including the section governing effluent limitations, which are designed according to ELGs and NSPSs; or (B) if "prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines necessary to carry out the provisions of this chapter." CWA § 402(a)(1). Subsection (B) is explicit that it applies only "*prior* to the taking of necessary implementing actions" relating to the requirements in subsection (A). (Emphasis added). Thus, § 402(a)(1)(B) sets forth a system for assessing NPDES permits only until the EPA promulgates the requirements referenced in § 402(a)(1)(A) and does not contemplate that the EPA might never promulgate the requirements referenced in § 402(a)(1)(A). Rather, § 402(a)(1) supports that Congress assumed that "requirements," including effluent limitations, which are guided by ELGs and NSPSs, would be in place after an interim period.

While we conclude that the CWA is unambiguous that the EPA must promulgate ELGs and NSPSs for point-source categories listed in a plan pursuant to § 304(m), were we to find the statute ambiguous and consider whether the EPA's interpretation was based on a "permissible construction," we would reach the same conclusion.

The addition of § 304(m) to the CWA stemmed from Congress' frustration with "the slow pace in which these regulations [were] promulgated." S. Rep. No. 99-50, at 3 (1985) ("Although the EPA continues to move forward with developing guidelines for the installation of cleanup technology for . . . dischargers, the slow pace in which these regulations are promulgated continues to be frustrating. Of the 29 industrial

categories established in 1977 for which guidelines were required to be promulgated 5 still remain to be completed."). Congress's desire to speed up the promulgation of ELGs and NSPSs would be completely frustrated if § 304 were viewed merely as a planning mechanism and did not require the actual promulgation of ELGs and NSPSs. The Senate Report quoted confirms that Congress did not view § 304 as a planning mechanism. It states that "[g]uidelines are *required* for any category of sources discharging significant amounts of toxic pollutants. In this use, 'significant amounts' does not require the [EPA] to make any determination of environmental harm; any non-trivial discharges from sources in a category *must lead to effluent guidelines*." *Id.* at 24-25 (emphasis added).

Our recent opinion in *OCEF* does not contradict our interpretation. In *OCEF*, we held that the EPA's decisions on "whether to revise the effluent guidelines and whether to incorporate technology-based criteria in its periodic review of the guidelines" were discretionary duties. 527 F.3d at 845. The duty that the *OCEF* court found to be discretionary was entirely distinct from the duty at issue in this case. This case addresses whether there is a mandatory duty to promulgate ELGs and NSPSs once a point-source category has been identified in a plan under § 304(m). In contrast, the *OCEF* court considered the EPA's duty to consider technology-based criteria when it was performing its mandatory duty to review effluent limitations and ELGs. *Id.* at 849. Though the *OCEF* court found the statute to be ambiguous on that point and did not conclude that the duty to consider technology-based criteria was mandatory, the court acknowledged that "when Congress specifies an obligation and uses the word 'shall,' this denomination usually connotes a mandatory command." *Id.* at 847 (citing *Alabama v. Bozeman*, 533 U.S. at 153). And later, in discussing the EPA's duties in connection with the identification of new polluting sources, the *OCEF* court acknowledged that if a source has any non-trivial discharge of toxic pollutants, the EPA does not make a determination of

environmental harm but "*must*" promulgate effluent guidelines. *Id.* at 852 (citation omitted) (emphasis added).

Despite our conclusion that the EPA had a non-discretionary duty to promulgate ELGs and NSPSs in this case, we also must consider whether the EPA properly avoided this duty when it removed the construction industry from its plans published pursuant to § 304(m). Nothing in the CWA expressly *grants* the EPA the authority to remove a point-source category from a § 304(m) plan. *Cf.* 42 U.S.C. § 7412(c)(9) (Clean Air Act provision expressly granting the EPA the authority to delist source categories). Moreover, we do not find the EPA's view, that it is allowed under the statute to unilaterally delist a point-source category already identified in a § 304(m) plan with no process, to be a permissible construction of the statute. *See Chevron*, 467 U.S. at 843.[10]

First, § 304(m)(1)(c) is clear that once a category is identified under subsection B, the promulgation of guidelines "*shall* be no later than . . . 3 years after the publication of the plan*.*" This timeline effectuates Congress' stated desire to force the EPA to more rapidly promulgate ELGs and NSPSs. If the EPA had the authority to delist point-source categories at its whim, however, this deadline would be rendered meaningless as the EPA could delist any point-source category to avoid the deadline set forth in § 304(m)(1)(c).

[17] Second, § 304(m)(2) provides that "[t]he Administrator shall provide for public review and comment on the plan

_____

[10]We need not reach the question of whether the EPA could avoid promulgating ELGs and NSPSs for a point-source category that had, at one time, been included in a § 304(m) plan if the EPA formally amended the § 304(m) plan that triggered the duty to promulgate or undertook some other formal process to delist the point-source category. Here, the EPA has not established that it engaged in any such process but has submitted its statements in its 2004 and 2006 § 304(m) plans that it was "not identifying" the construction industry, which had previously been identified in earlier plans, as a point-source category.

prior to final publication." Thus, Congress determined that by the time a point-source category is listed in a § 304(m) plan, the EPA must have already engaged in a review process to consider *whether* the category should be listed. It follows logically that the three-year delay provided for in § 304(m)(1)(c) is not to decide *whether* to list a point-source category, but to allow the EPA to consider what the *substance* of the ELGs and NSPSs should be.

## CONCLUSION

For these reasons, we AFFIRM the district court.