FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; PACIFIC ENVIRONMENT; TURTLE ISLAND RESTORATION NETWORK, *Plaintiffs-Appellants*, <br><br> v. <br><br> EXPORT-IMPORT BANK OF THE UNITED STATES; FRED P. HOCHBERG, in his official capacity as Chairman and President of the Export-Import Bank of the United States, *Defendants-Appellees.* | No. 16-15946 <br><br> D.C. No. 4:12-cv-06325-SBA <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Saundra B. Armstrong, District Judge, Presiding

Argued and Submitted November 13, 2017
San Francisco, California

Filed June 28, 2018

Before:  Ronald M. Gould and Mary H. Murguia, Circuit Judges, and James E. Gritzner,[*] District Judge.

Opinion by Judge Gritzner

**SUMMARY**[**]

**Environmental Law / Mootness / Standing**

The panel affirmed the district court's grant of summary judgment in favor of the Export-Import Bank of the United States, and its chairman, based on the plaintiff environmental groups' lack of standing to bring their challenge to the Bank's authorization of nearly $4.8 billion in financing for two liquid natural gas projects near the Great Barrier Reef in Australia.

Plaintiffs sought relief based on defendants' alleged violations of their procedural rights under the Endangered Species Act and the National Historic Preservation Act.

The panel held that events subsequent to the district court's ruling – the completion of the projects and disbursement of the loans - did not render plaintiffs' claims moot.  The panel held that given the record, it was unable to determine whether the entirety of the transaction had been

---

[*] The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

concluded, and defendants had not met their heavy burden to establish mootness on appeal.

The panel held that the plaintiffs lacked standing because even under the relaxed redressability standards that were properly applied by the district court, plaintiffs failed to show that the Bank's performance of the additional procedures, required under the Endangered Species Act and the National Historic Preservation Act before approving financing of the projects, could redress the alleged environmental injury in this case.

## COUNSEL

Brendan Ridgely Cummings (argued), Center for Biological Diversity, Joshua Tree, California; Miyoko Sakashita and Emily S. Jeffers, Center for Biological Diversity, Oakland, California; Sarah Uhlemann, Center for Biological Diversity, Seattle, Washington; for Plaintiffs-Appellants.

Eric Allen Grant (argued) and Ellen J. Durkee, Attorneys; John C. Cruden, Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Lauren T. Nguyen, Senior Counsel, Export-Import Bank of the United States, Washington, D.C.; for Defendants-Appellees.

**OPINION**

GRITZNER, District Judge:

In 2012, the Export-Import Bank of the United States (the Ex-Im Bank) authorized nearly $4.8 billion in financing for two liquid natural gas (LNG) projects in Queensland, Australia, near the Great Barrier Reef (the Projects). Plaintiffs-Appellants, environmental organizations, sued the Ex-Im Bank and its chairman (collectively, Defendants) for violations of the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*, the National Historic Preservation Act (NHPA), 54 U.S.C. § 307101 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. § 706. Plaintiffs argue that the Ex-Im Bank failed to follow the proper procedures set forth in the ESA and NHPA before approving financing for the Projects.

On cross-motions for summary judgment, the district court found that Plaintiffs were unable to establish that a decision in this case would redress the Projects' environmental harms, and thus the Plaintiffs lacked standing. Plaintiffs appealed. Following the district court's ruling, work on the Projects continued, and the Ex-Im Bank fully disbursed both of its loans—one of which has been repaid. Defendants argue that this entire action is now moot. We hold that the action is not moot and affirm the district court on the question of standing.

## I.  BACKGROUND

The Ex-Im Bank is the official export credit agency (ECA) of the United States. Acting pursuant to federal statute, 12 U.S.C. § 635 *et seq.*, the Ex-Im Bank offers funds to projects undertaken in the United States and around the globe to support procurement of goods and services from

U.S. exporters by the project sponsors.  The purpose of these efforts is to keep U.S. exporters competitive with foreign exporters—many of whom are supported directly by foreign governments or by foreign ECAs.

In 2012, the Ex-Im Bank authorized nearly $4.8 billion in financing for two LNG projects in Queensland, Australia. For both Projects, the primary U.S. exporter was the Bechtel Corporation, a contractor that performs engineering, procurement, and construction work.  For most Ex-Im Bank loans, including those at issue here, disbursements are not made until the borrower submits proof that the loan funds will be directed to expenses for U.S. exporters pursuant to the terms of the loan.

In May 2012, the Ex-Im Bank authorized a $2.95 billion direct loan (the APLNG Loan) for the Australia Pacific LNG Project (APLNG Project), a joint venture owned and operated by Origin Energy Limited, ConocoPhillips, and the China Petrochemical Corporation (Sinope).  The APLNG Project involves "upstream" and "downstream" components.  The upstream component includes natural gas wells in interior Queensland as well as pipelines to transport the natural gas to the downstream production facility on the coast.  The downstream component, located on Curtis Island near the town of Gladstone, Australia, includes an LNG production facility, where natural gas is converted to a liquid state, and facilities to transport the LNG onto oceangoing tankers for shipping.

The cost of the APLNG Project was estimated to be approximately $12 billion for the downstream component and approximately $16 billion for the upstream component. The upstream component was not funded by the Ex-Im Bank.  The APLNG Loan thus made up approximately 25%

of the downstream component's estimated costs and 10.5% of the overall project costs.

In December 2012, the Ex-Im Bank authorized a $1.8 billion direct loan (the QCLNG Loan) for the Queensland Curtis LNG Project (QCLNG Project), which is owned and operated by BG Energy Limited. The QCLNG Project has separate upstream and downstream components similar to the APLNG Project, with gas wells and pipelines in interior Queensland and an LNG production facility and shipping facilities on Curtis Island on the coast. As with the APLNG Project, the upstream component of the QCLNG Project was not funded by the Ex-Im Bank. The cost of the downstream component of the QCLNG Project was estimated to be approximately $9.9 billion, and the entire cost of the QCLNG Project was estimated to be approximately $20 billion. Thus, the QCLNG Loan made up approximately 18% of the downstream component's estimated costs and 9% of the overall project costs.

Both Projects are located within the Great Barrier Reef World Heritage Area. The Great Barrier Reef World Heritage Area encompasses the world's largest coral reef system, representing about 10% of the world's coral reef area. In 1981, the Great Barrier Reef was included on the World Heritage List in recognition of its scientific, ecological, and aesthetic value. The habitats within the Great Barrier Reef World Heritage Area support many threatened and endangered species. Because the Projects both would result in massive industrial facilities located within this area and would also result in significantly increased shipping nearby, the entities behind the Projects submitted environmental analyses to the Australian government. The Australian government approved the Projects based on its assessment of the proposed

environmental impacts and the effects of proposed mitigation measures prior to the Ex-Im Bank's approval of the Projects' respective loans. Notwithstanding Australia's approval of the Projects, in 2011 the World Heritage Committee expressed "extreme concern" about LNG facility development on Curtis Island within the Great Barrier Reef World Heritage Area.

The Ex-Im Bank, before approving the loans for each of the Projects, conducted a review of the Projects' environmental impacts, relying on the environmental impact statements submitted to the Australian authorities as well as other relevant documents. Plaintiffs allege that the Ex-Im Bank did not engage in a consultation pursuant to Section 7 of the ESA, 16 U.S.C. § 1536(a)(2), and that the review the Ex-Im Bank did perform did not satisfy the Ex-Im Bank's duty to take into account the Projects' impacts on the Great Barrier Reef World Heritage Area as required by the NHPA. Documents in the record suggest that the Ex-Im Bank did condition financing on certain reporting obligations that would allow the Ex-Im Bank to ensure the Projects continued to comply with Australian environmental law. However, the record on appeal does not include the terms of the loan agreements themselves, which may disclose greater or more specific rights and obligations.

By the time the Ex-Im Bank approved financing, each of the Projects had already commenced. Construction of the downstream component of the QCLNG Project—the component partially financed by the Ex-Im Bank's loan—was about 46% complete by the time the Ex-Im Bank approved its loan for that project in December 2012. Construction for the APLNG Project was also underway when the Ex-Im Bank authorized financing.

On December 13, 2012, Plaintiffs filed suit in federal district court challenging the Ex-Im Bank's decisions to fund the Projects. Plaintiffs are non-profit organizations dedicated to promoting the protection of wildlife and wildlife habitats. Plaintiffs have members with various interests in the preservation of the Great Barrier Reef World Heritage Area and assert that the Projects will contribute substantially to environmental degradation in that important area. Plaintiffs allege that the Projects would harm Plaintiffs' members' interest in conserving critical habitats for various species and would reduce the area's aesthetic appeal. Plaintiffs' original complaint challenged only the Ex-Im Bank's funding decision for the APLNG Project. On October 4, 2013, Plaintiffs amended their complaint to challenge the Ex-Im Bank's funding for the QCLNG Project. Plaintiffs requested declaratory relief and an injunction that would compel the Ex-Im Bank to comply with the ESA's and NHPA's procedural requirements.

On March 31, 2016, the district court granted Defendants' Cross-Motion for Summary Judgment. The district court found that as a threshold matter, Plaintiffs lacked standing to pursue either of their NHPA or ESA claims. The district court found that Plaintiffs failed to establish redressability, necessary for standing, because Plaintiffs did not offer a sufficient basis to determine that there was a reasonable probability the Projects would be halted if the Ex-Im Bank's funding was vacated. The district court highlighted that funding from the Ex-Im Bank constituted a relatively small percentage of the costs of the Projects and that the Projects had already begun before securing Ex-Im Bank approval and had made substantial progress to that point. The district court also noted the large financial resources available to the principals behind the Projects. The district court noted that another LNG project

had also gone forward on Curtis Island without receiving any funding from the Ex-Im Bank.

Progress continued on construction of the Projects prior to and following the district court's summary judgment order.  On August 23, 2017, construction was completed on the APLNG Project.  The APLNG Loan was fully disbursed on March 30, 2017.  The QCLNG Loan was fully disbursed on December 15, 2015, and was fully repaid on July 17, 2017.[1]  Both production trains for the QCLNG Project were operational beginning in November 2015.

Plaintiffs appeal the district court's order granting summary judgment based on Plaintiffs' lack of standing. Defendants argue that even if Plaintiffs had standing at the outset of litigation, the case is now moot on appeal based on the progress of the Projects, including the full disbursement of both loans and repayment of the QCLNG loan.

## II.  STANDARD OF REVIEW

We review a district court's summary judgment ruling de novo.  *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1079 (9th Cir. 2015).  We must also be sure that we possess jurisdiction at every stage of the litigation, including when questions of mootness arise on appeal.  *See Timbisha Shoshone Tribe v. U.S. Dep't of Interior*, 824 F.3d 807, 811–12 (9th Cir. 2016).

---

[1] The declaration in the record states that the QCLNG Loan was "prepaid," but this is a typographical error; at oral argument, counsel clarified that the QCLNG Loan had in fact been repaid.

## III.  DISCUSSION

### A.  Mootness

Defendants argue that even if Plaintiffs possessed standing at the summary judgment stage before the district court, Plaintiffs' claims are now moot.  As a threshold question, we must address whether events subsequent to the district court's ruling have rendered claims moot.  *See Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc).

Defendants bear a "heavy burden" to establish mootness at the appellate stage.  *Id.* (citation and internal quotation marks omitted).  To establish mootness, Defendants must show that "there is no longer a possibility that [Plaintiffs] can obtain relief for [their] claim."  *Timbisha Shoshone Tribe*, 824 F.3d at 812 (citation omitted).  Put another way, a case is moot on appeal "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party."  *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)).

Defendants argue that because the Projects are now completed, the loans have been disbursed, and one loan has been fully repaid, the Ex-Im Bank can do nothing to affect the environmental impact of the Projects.  Focusing solely on these core allegations, it seems highly unlikely that the Ex-Im Bank possesses the power at this point—if its loan agreements were invalidated by a federal court—to alter the course of the Projects.

But it also seems possible, even if purely conjectural, that the Ex-Im Bank could relax or diminish any remaining contractual duties owed to it in exchange for greater

environmental remediation or reporting.  Defendants bear the burden to establish that relief is not simply unlikely or conjectural but impossible.  *See Timbisha Shoshone Tribe*, 824 F.3d at 812.  The fact that the loans have been disbursed does not in and of itself establish that relief is *impossible* if the Ex-Im Bank were sent back to the negotiating table for the purpose of obtaining additional environmental protection.

At oral argument, Defendants stated that as to the QCLNG Loan, which has been repaid, there was "no relationship whatsoever" remaining between the Ex-Im Bank and the QCLNG Project.  But the actual loan agreements at issue are not part of the record in this case on appeal.  That record vacuum impairs the Defendants' ability to meet their burden.  We are therefore unable to determine that repayment of the QCLNG Loan means that the entirety of the transaction has been concluded.  Defendants bear a heavy burden to establish mootness on appeal—the bare assertion is not enough under the applicable standard.  *See Chinese for Affirmative Action v. Leguennec*, 580 F.2d 1006, 1009 (9th Cir. 1978) ("[T]he record before us sheds no light on the problem, and the city's own statement of mootness cannot support an affirmance on that ground.").  Defendants have not met their burden to establish mootness on appeal.

## B.  Standing

The district court granted summary judgment in favor of Defendants, concluding that Plaintiffs lacked standing.  Specifically, the district court found that Plaintiffs failed to establish redressability due to the Ex-Im Bank's minor role in the development of the Projects.  Plaintiffs argue that the district court failed to apply the proper standard for cases involving a "procedural" injury and that a favorable federal

court decision would provide some relief for their alleged injuries.

To establish constitutional standing, a plaintiff must show it has suffered an "injury in fact," that the injury is "fairly traceable" to the conduct at issue in the plaintiff's claim, and that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). "The party invoking federal jurisdiction bears the burden of establishing these elements . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).[2] Thus, at the summary judgment stage, a plaintiff must offer evidence and specific facts demonstrating each element. *Id.*

Plaintiffs' injuries arise out of the construction and continued operation of the Projects near the Great Barrier Reef. The Ex-Im Bank, however, is not building or operating the Projects; it only provided a portion of their funding. The Projects, located in Australia, are being built and operated at the direction of other entities. The Supreme Court has observed that it is more difficult to establish causation or redressability in situations where "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*." *Id.* at 562 (emphasis in original). Where an essential element

---

[2] The parties do not dispute that Plaintiffs established an injury in fact. While the district court's order and the discussion herein focus primarily on redressability, causation and redressability "are two sides of the same coin," *Animal Legal Def. Fund v. Veneman*, 469 F.3d 826, 835 (9th Cir. 2006), *vacated on other grounds*, 490 F.3d 725 (9th Cir. 2007) (en banc), and are often addressed in conjunction, *see Nat. Res. Def. Council v. E.P.A.*, 542 F.3d 1235, 1245 (9th Cir. 2008).

of standing depends on the reaction of a third party to the requested government action or inaction, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made." *Id.* This is not a requirement for heightened scrutiny in such situations but an observation of what facts are logically necessary to allege or prove (depending on the stage of the litigation) that a favorable federal court ruling will ameliorate the claimed injury, making the dispute one that is "appropriately resolved through the judicial process." *Cf. id.* at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

Pivotal to the analysis herein, Plaintiffs seek relief based on Defendants' alleged violations of procedural rights under the ESA and NHPA. Plaintiffs bringing procedural-rights claims can establish standing "without meeting all the normal standards for redressability and immediacy." *Id.* at 572 n.7. Specifically, a plaintiff pursuing violations of procedural rights need not establish the likelihood that the agency would render a different decision after going through the proper procedural steps. *Id.*; *see also Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 976 (9th Cir. 2003) ("A petitioner who asserts inadequacy of a government agency's environmental studies . . . need not show that further analysis by the government would result in a different conclusion." (alteration in original) (citation and internal quotation marks omitted)). Instead, "a litigant need only demonstrate that he has a procedural right that, if exercised, could protect his concrete interests and that those interests fall within the zone of interests protected by the statute at issue." *Cottonwood*, 789 F.3d at 1083–84 (quoting *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 783 (9th Cir. 2014) (en banc)).

Despite this relaxed standard, a claim still lacks redressability if the plaintiff will nonetheless suffer the claimed injury if a court rules in its favor. *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1227 (9th Cir. 2008). In cases where the alleged injury in fact is caused by a third party, a plaintiff must establish that the hoped-for substantive action on the part of the government could alter the third party's conduct in a way that redresses the injury in fact. *See Pub. Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1017–18 (9th Cir. 2003), *rev'd on other grounds*, 541 U.S. 752 (2004) ("Nevertheless, we find dispositive the lower threshold for causation in procedural injury cases, which often involve third parties whose independent actions are necessary for constitutional injury to occur.").

Our prior decisions illustrate the operation of this relaxed standard in cases where the agency defendant had clear regulatory authority over the third party who more directly caused the plaintiff's injury in fact. In such cases, the plaintiff's task of showing that the requested relief could affect the conduct of third parties is fairly straightforward. For example, in *Public Citizen*, the plaintiffs' injuries in fact (harms arising from increased emissions from foreign trucks) were caused directly by third-party foreign truck operators, and the defendant agency was responsible for granting or denying permits to allow those foreign truck operators to operate in the United States. *Id.* at 1012–13, 1018. Applying the relaxed standard for procedural-injury claims, we held that a change in agency decisionmaking (from granting the permits to denying the permits, even temporarily) would necessarily determine whether foreign truck operators would then operate in the relevant areas of the United States. *Id.* at 1019. In other words, the link between the government action and the actions of third parties that would redress the injuries in fact was clear and

direct. *See also Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 808, 818–20 (9th Cir. 2017) (finding redressability in a challenge to Department of Defense approval of "location, construction, and specifications for a military base in Okinawa, Japan"); *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 476–77 (9th Cir. 2011) (finding redressability in a challenge to regulations controlling third-party actions on federal grazing lands); *Nat. Res. Def. Council v. E.P.A.*, 542 F.3d 1235, 1240–41, 1245–46 (9th Cir. 2008) (finding redressability in a challenge to an agency decision not to promulgate new regulations covering construction industry).

Other cases involving the relaxed standard for redressability involved an agency defendant that was in some way an integral participant in a third-party's allegedly harmful action. In *Natural Resources Defense Council v. Jewell*, the agency defendant managed a California water storage and distribution system and entered into water-rights contracts with third parties. 749 F.3d at 780. The plaintiffs sought an injunction requiring procedural compliance and ultimately renegotiation of the challenged contracts. *Id.* at 781. We held that the plaintiffs had standing to make a procedural claim against the agency. *Id.* at 782–83. Though we did not specifically address the likelihood that third-party water rights holders would accept new contracts with stronger environmental terms, the ESA issue only arose because the agency had decided to renew the contracts in the first place. *See id.* at 785. But for the agency's actions, the alleged injury in fact never would have arisen.

The Ex-Im Bank has a statutory duty to take into account the potential beneficial and adverse environmental effects of goods and services for which support is requested and to withhold financing for environmental reasons. 12 U.S.C.

§ 635i-5(a)(1)–(2). Plaintiffs also point to evidence in the record that here the Ex-Im Bank requested environmental information, reports, and updates from the Projects' proponents, who were cooperative in the environmental planning process.

Yet, unlike the cases discussed above where a federal agency has direct regulatory authority over the relevant third party, here the Bank's authority to alter the Projects once approved would be implemented through financing conditions. Noticeably absent from the record in this case are the funding contracts themselves, which might provide evidence of what action could be taken by the Ex-Im Bank to alter the course of the Projects, if the Bank were to perform the procedures that are required under the NHPA and the ESA.

Moreover, Plaintiffs have not established that the Ex-Im Bank was a necessary party without whom the Projects would not have been realized. The Projects were already underway before the Ex-Im Bank committed financing, and the Ex-Im Bank provided only a minority portion of the Projects' financing. Plaintiffs point to Ex-Im Bank memoranda for each Project stating that the Ex-Im Bank perceived its support to be needed for each Project. These memoranda refer to limited financing capacity in the capital markets and also state that at least one other foreign ESA was already involved in financing each Project. Plaintiffs also point to the sheer size of the loans and their proportion of the financing for the downstream components of the Projects, arguing that the Ex-Im Bank had the power to impose additional environmental conditions on the Projects. However, the fact that both Projects were already underway by the time funding from the Ex-Im Bank was authorized— nearly halfway complete in the case of the QCLNG

Project—suggests that the Projects did not rely on Ex-Im Bank financing.  The record shows that the Projects' joint venture partners possessed considerable financial resources, as did other lenders in the capital markets and other ECAs that would have supported the Projects in exchange for the Projects' procurement from non-U.S. companies.  One other LNG Project on Curtis Island went forward with financing by ECAs from Australia, Canada, and Italy—not the Ex-Im Bank.   The Ex-Im Bank itself stated it believed that financing for the Projects, if not provided by the Ex-Im Bank, would have been provided by foreign ECAs or governments.

Even under the relaxed redressability standards that are properly applied here, on these facts Plaintiffs have failed to show that performance of the additional procedures required under the NHPA and the ESA could redress the alleged environmental injury in this case.

## IV.  CONCLUSION

We hold that Plaintiffs failed to meet their burden to establish redressability and thus lack standing.  We affirm the district court's grant of summary judgment in favor of Defendants.

**AFFIRMED.**